# UNDER SEAL

IN THE UNITED STATES DISTRICT COURT FOR THE



EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | **Under Seal** |
| ADIL HASAN, | ) | |
| YOUSIF AL MASHHADANI, | ) | 1:17mj143 |
| AND ENAS IBRAHIM | ) | |

## Affidavit in Support of an Application for a Criminal Complaint, Arrest Warrants, and Summons

I, Sean P. MacDougall, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and am assigned to the Washington Field Office. I have been an FBI Special Agent for approximately fourteen months, in which time I have investigated several violations to include international terrorism, immigration fraud, and white collar crimes. I have a Bachelor of Science Degree from The United States Naval Academy in Political Science with a concentration in Constitutional Studies. I am a graduate of the FBI Academy at Quantico, Virginia, and have had extensive training in federal law.

2.      This affidavit is submitted in support of a criminal complaint charging Adil Hasan, Yousif Al Mashhadani, and Enas Ibrahim with attempting to obtain naturalization contrary to law, in violation of 18 U.S.C. § 1425.

3.      The information contained in this affidavit is based on my personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officials, personal review of records, documents, other physical evidence obtained during this investigation, and information I have gained through my training and experience. This affidavit contains information necessary to support probable cause. It is not

intended to include each and every fact and matter observed by me or known to the United States Government.

A.   Majid Al Mashhadani and the Kidnapping of a U.S. Citizen

4.      I know from media reports and FBI reports that a U.S. citizen, identified here by the initials R.H., was kidnapped in Iraq on November 1, 2004, and held with other hostages for months in horrible conditions in an underground bunker.  His release was eventually secured through a raid conducted in 2005.  Majid Al Mashhadani ("Majid") was detained in Iraq in connection with the kidnapping of R.H.  In a Mirandized interview conducted by FBI agents in Iraq in November 2005, Majid admitted his complicity in the kidnapping of R.H.

B.   Majid Al Mashhadani's Brothers

5.      Based on the records of the Department of Homeland Security (DHS), I know that Yousif Mohammed Hasan Al-Mashhadani ("Yousif") is a 35 year-old year old male from Iraq who was admitted to the United States as a refugee in 2008.  In May 2013, Yousif resided in Vienna, Virginia, and applied for naturalization as a citizen of the United States by signing under penalty of perjury and submitting a Form N-400, Application for Naturalization, to United States Citizenship and Immigration Services ("USCIS").  In connection with Yousif's applications for status in United States, his fingerprints were taken.  According to an FBI fingerprint specialist, analysis conducted on or around November 17, 2013 determined that his fingerprints match those on a document seized by the forces that rescued R.H. from the property in Iraq at which R.H and others were held hostage in 2004 and 2005.

6.      Based on the records of the Department of Homeland Security, I know that an individual identified here by the initials A.M. is a 45-year-old male from Iraq who was admitted to the United States on a visa in connection to his status as an Iraqi official in August 2007.  In

2

the course of his application for staying in the United States to USCIS in 2007 and again in late 2015, A.M. disclosed that he was the full brother of Majid, Yousif and Adil Hasan ("Adil").

7.      In a sworn statement given during his naturalization interview by USCIS on December 7, 2015, A.M. again attested that Majid, Adil, and Yousif were his full biological brothers. A.M. told USCIS that A.M. and his three brothers had the same mother and father, and grew up and lived in the same house in Al Tahir, Baghdad, Iraq until 2000, when A.M. was married. A.M. said that he last saw Majid in Baghdad in 2005 before Majid was arrested. A.M. said that he spoke to Majid over the phone in 2007, when Majid was released from prison.

8.      In the sworn statement, A.M. attested that he was never arrested or detained in Iraq nor were any of his other family members, other than Majid. A.M. also attested that none of his family members other than Majid had been detained or kidnapped as far as he knew.

9.      A.M. said that Majid's wife told A.M. that Majid had been accused of being a terrorist and supporting a terrorist group, but A.M. claimed to not know what Majid had done or which group he had supported. A.M said that, to the best of his knowledge, Majid was alive and living near Baghdad. Although A.M.'s application for immigration status contained the assertion that Majid had died, A.M. said that the statement was mistakenly written by A.M.'s attorney. A.M. said that he last spoke to Majid on the telephone around 2013.

10.     Based on records of the Department of Homeland Security, I know that Adil is a 38 year-old male from Iraq, who was admitted to the United States as a refugee in 2008. In June 2013, Adil resided in Burke, Virginia, and applied for naturalization as a citizen of the United States by signing under penalty of perjury and submitting Form N-400 to USCIS.

11.     Based on records of the Department of Homeland Security, I know that Enas Ibrahim is the wife of Adil, and a 32-year old female from Iraq who was admitted to the United

3

States as a refugee in 2008. In June 2013, Ibrahim resided in Burke, Virginia, and applied for naturalization as a citizen of the United States by signing under penalty of perjury and submitting Form N-400 to USCIS.

II. Visa Fraud

A. Omission of Mention of Family Relationship to Majid

12. I have reviewed immigration documents pertaining to Yousif's applications to obtain classification as a refugee and legal permanent resident status in the United States. His file indicates that, in or about January 2007, he first registered with the United Nations High Commissioner for Refugees ("UNHCR") through a UNHCR Resettlement Registration Form, and then was referred to the International Organization for Migration ("IOM") to complete an application to be sent to the United States. The UNHCR Resettlement Registration Form contains identification information for Yousif's wife, son, and twenty other relatives including A.M., Adil, half-brothers and -sisters—but no reference to Majid.

13. On April 30, 2008, in Amman, Jordan, Yousif was interviewed under oath by a USCIS officer about his USCIS Form I-590, Registration for Classification as a Refugee, along with a Sworn Statement of Refugee Applying for Admission into the US, a biographic information form known as a Form G-325C, a statement regarding the persecution he faced in Iraq, and a Worldwide Refugee Admissions Processing System family tree report. On the basis of those documents and his testimony, the USCIS approved Yousif's application to enter the United States.

14. On that Worldwide Refugee Admissions Processing System family tree report, Yousif was required to identify members of his immediate family, to include biological brothers and sisters. Yousif listed A.M. and Adil as his brothers, but did not list Majid on any part of the

4

form. On March 4, 2016, my FBI colleagues interviewed Yousif, and asked him why he failed

to include reference to Majid on the family tree form. Yousif said that he omitted reference to

Majid on the form because, when he was a refugee, he was told by others applying for refugee

status that he would not be allowed into the United States if any immediate family members had

a criminal background. Yousif said, ""What other choice did I have?"

15.     I also reviewed immigration documents pertaining to Adil's applications to obtain

classification as a refugee and legal permanent resident status in the United States. His file

indicates that, in or about January 2007, he first registered with the UNHCR through a UNHCR

Resettlement Registration Form, and then was referred to the IOM to complete an application to

be sent to the United States. On April 30, 2008, in Amman, Jordan, Adil was interviewed under

oath by a USCIS officer about his USCIS Form I-590, Registration for Classification as a

Refugee, along with a Sworn Statement of Refugee Applying for Admission into the US, a

biographic information form known as a Form G-325C, a statement regarding the persecution he

faced in Iraq, and a Worldwide Refugee Admissions Processing System family tree report. On

the basis of those documents and his testimony, the USCIS approved Adil's application to enter

the United States.

16.     On that Worldwide Refugee Admissions Processing System family tree report

form, Adil was required to identify members of his immediate family, to include biological

brothers and sisters; Adil listed Yousif and A.M. as his brothers, but did not list on any part of

the form Majid or any variation of Majid's name. The IOM then provided USCIS with Adil's

UNHCR Resettlement Registration Form, as well as his USCIS Form I-590, and accompanying

information, including the Worldwide Refugee Admissions Processing System family tree

report. USCIS approved immigration status on July 22, 2008.

17.    I also reviewed immigration documents pertaining to Enas Ibrahim's applications to obtain classification as a refugee and legal permanent resident status in the United States.  Her file indicates that, in or about April 2008, she filed a USCIS Form I-590, Registration for Classification as a Refugee, along with a Sworn Statement of Refugee Applying for Admission into the US, a biographic information form known as a Form G-325C, and a Worldwide Refugee Admissions Processing System family tree report.

18.    On March 4, 2016, my FBI colleagues interviewed Adil and Enas Ibrahim.  At that time, Adil admitted that Majid was his brother.  He further admitted that, before coming to the United States, Adil used the name Al Mashhadani.  Adil said that he visited Majid in 2013, at which time Majid told him that Majid had been cleared of wrongdoing.  Enas Ibrahim said that, while she and Adil were trying to achieve refugee status in order to get to Jordan from Iraq, she and Adil discussed not including Majid's name on their applications for refugee status because their connection to Majid might delay their ability to gain such status.

19.    My FBI colleagues interviewed Adil again on April 7, 2016.  On that date, he admitted that, when he applied for entry into Jordan sometime in 2006, he left Majid's name off of a document listing his immediate family; he said he thought that disclosing his relationship to Majid would prevent him and his family from relocating to Jordan because Majid had been arrested.  Adil said that, when he later completed the family tree paperwork in the course of applying as a refugee through the United Nations (as the first step to gain access to the United States as a refugee), he omitted reference to Majid because he had been told that his application would not be accepted if he included information on the new form that was not included on the form that he had previously completed.  Adil later retracted this statement, saying that he had simply forgotten to put Majid's name on the UN paperwork.

6

20.     On the basis of my training and experience, as well as my discussions with investigators in the FBI and in DHS, I suspect that Yousif and Adil each omitted disclosing his relationship to Majid on the family tree forms for the same reason discussed by Enas Ibrahim and Adil in paragraph 18; they feared that their applications would be more closely scrutinized as a result of their connection to Majid. Accordingly, I believe that their failure to disclose the existence of Majid as their brother was deliberate.

### B.  False Statements Creating a Story of Persecution

21.     To justify his application for refugee status, Yousif told the UNHCR in or about February 2008, that, while working as an anti-corruption investigator for the Iraqi Commission on Public Integrity in Iraq and in or about 2006, he started receiving threats from a Shiite militia known as the "Al Mahdi Militia," in order to coerce Yousif to drop a particular corruption investigation. Yousif told the UNHCR that, in May 2006, Adil was kidnapped by the Al Mahdi Militia, and only released after Yousif arranged to drop the investigation in question, and helped pay a large ransom. Yousif said that, after Adil was released, he (Yousif) reopened the corruption investigation, and after his parents' house was burned down, fled to Jordan in October 2006. Yousif repeated his story to IOM in March 2008, and then again in connection with the USCIS Form I-590 discussed in paragraph 13.

22.     To justify his application for refugee status, Adil provided to USCIS in April 2008 sworn testimony that, in 2006, he had been kidnapped by members of the Al Mahdi Army and held for nearly a month. Adil claimed that he had been tortured by his kidnappers, and provided medical documentation of injuries sustained by the torture. Adil said that he was released upon the payment of a ransom in the amount of $20,000.

7

23.     In April 2016, my FBI colleagues asked Adil about times that he was persecuted or threatened in Iraq. Adil told them that he was threatened on two occasions. Adil said that, first, he was shot at by unknown assailants when he was driving to his work in the Green Zone in 2004 or 2005; he said that he suspected that he had been targeted as a result of A.M.'s work as a member of an Iraqi Government agency investigating corruption by the Shia leadership. Adil said that, on another occasion, he was stopped in 2005 by members of a Sunni militia in Taji, Iraq. Adil said that he hid his Green Zone identification card since the Sunni militia viewed those working with the coalition forces as their enemies. Adil said that the militia did not find Adil's identification card, and he was allowed to leave. In this interview, Adil made no mention of having been kidnapped, held hostage, and tortured for nearly a month.

24.     In October 2016, my FBI colleagues confronted Adil about the discrepancy about the persecution he faced in Iraq between what he represented in 2008 in connection with his refugee claim and what he told me earlier in April 2016. In response, he admitted that he had embellished his persecution story in 2008 after being told to do so by other refugees located in refugee camps in Jordan. Adil told me the true story was that he had been stopped by a Shia militia at a checkpoint on his way home from work in the Green Zone. He said that they took him from his car and held him in a house for four or five hours, hitting him with an open hand on his shoulder. He said that he was released, without any money being paid for ransom.

25.     In October 2016, DHS Immigration and Customs Enforcement (ICE) Homeland Security Investigations ("HSI") Special Agent Jon Nakagawa asked Yousif about any persecution that he or his family faced while in Iraq. Yousif said the only instance he could recall was when Adil had been stopped by Shia militia members on Adil's way home from work, and detained for approximately five hours before being released. SA Nakagawa then confronted

Yousif about the discrepancy regarding the persecution that Adil faced in Iraq between what

Yousif represented in 2008 in connection with his refugee claim and what he just told him.

Yousif told him that he and Adil had fabricated the kidnapping story in order to obtain entry into

the United States. He admitted that they discussed the details of the story while sitting in the

Jordanian refugee camp. Yousif admitted that, aside from a five-hour detention at the

checkpoint, Adil had not been kidnapped, and that no ransom was ever paid to get him back.

### C. False Statements on Naturalization Applications

26.    According to DHS records, Adil applied for naturalization in June 2013, and

identified himself as Adil Mohammed Hasan. At Part 1C, the application stated: "If you have

ever used other names, provide them below." In response, "N/A" was typed into the box for

other names. He also listed "N/A" on his Form G325A submitted in support of his Form I-485,

Application to Register Permanent Residence or Adjust Status. I understand "N/A" to signify

"not applicable." However, those responses were deceptive because Adil routinely used the

family name Al-Mashhadani before coming to the United States. For example, five years earlier,

in response to the prompt "All Other Names Used" on the Form G-325C he submitted to USCIS

with his Form I-590 in April 2008, he included the name "AL MASHHADANI, Adel

Mohammed Hasan." Indeed, I have seen a copy of Adil Hasan's Iraqi passport issued in 2007;

on that passport, his "SURNAME" is "Al-Mashhadani."

27.    Further, I have seen a copy of a badge bearing Adil's photograph that, until the

badge expired in 2007, authorized him access to the "International Zone" in Baghdad, Iraq; that

badge bore the name "Adel Al Mashhadani." Finally, I also have seen a medical report from the

director of medical affairs at "Arab Medical Center" dated June 27, 2007, that was included with

Adil's application for refugee status in the United States to show that Adil had a heart problem;

that medical report referred to the patient as "Adel Mohammad Al Mashhadani." I believe that Adil omitted reference to his use of the name Al-Mashhadani on his naturalization application because he feared that his family connection to brother Majid might hinder his chances of getting his naturalization approved.

28.     In June 2013, Enas Sulaiman Ibrahim submitted her Form N-400, Application for Naturalization. Part 1C of that form directed that "If you have ever used other names, provide them below." In response, Ibrahim did not disclose that she used the name "Enas Sulaiman Ibrahim Almashhadani" and provided no other names.

29.     On the G-325C form that Ibrahim submitted to USCIS in April 2008, in connection with her Form I-590, Registration for Classification as Refugee, she admitted that she also used the name "Enas Sulaiman Ibrahim Almashhadani." Within the records of Ibrahim's Alien file is contained a photo identification certificate bearing the name, in Arabic, Enas Sulaiman Ibrahim Al Mashhadani. I believe that Enas Ibrahim omitted on her naturalization application that she previously used the name Almashhadani (or Al Mashhadani) because she feared that, if she did so, her applications would be scrutinized more closely as a result of her husband's family relationship to Majid.

30.     On the Forms N-400, Applications for Naturalization, that Yousif and Adil submitted to USCIS in May and June 2013, each answered "no" to questions 23 and 24, which read "have you ever given false or misleading information to any US Government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?" and "Have you ever lied to any US Government official to gain entry or admission into the United States?" Each signed this form certifying under penalty of perjury that this information was true. In light of the facts that in connection with their applications for refugee status, (a) each provided

10

to the UNHCR and IOM for submission to USCIS a family tree that omitted their relationship to brother Majid; and (b) each created a bogus story about Adil being kidnapped and held for ransom, their certifications on their naturalization applications were, in fact, false.

III.   Wire Fraud

31.    I have seen records from Brown's Toyota in Fairfax, Virginia, reflecting that, on or about January 8, 2015, Adil Hasan and Enas Ibrahim jointly purchased a 2014 Nissan Pathfinder from Brown's Nissan for $39,074.56. According to those records, Hasan and Ibrahim paid for the vehicle with a down payment of approximately $10,000, and a loan to them both from Nissan Motors Acceptance Corporation ("NMAC"), in Sacramento, California, for the balance of the purchase price.

32.    Brown's Toyota records reflect that Hasan and Ibrahim successfully obtained a loan for $32,859.60 based on the information provided on the loan application regarding their income; the loan application was signed by both Hasan and Ibrahim, and then transmitted to NMAC for approval electronically. In the application, Hasan represented that his income was $4,000 (over a period of time that was not specified) from a company identified as United States Transportation, and claimed to have been employed by that company for two years. He also claimed income of $48,000 per year from other sources. Enas Ibrahim claimed an income of $36,000 per year, and represented that she had been employed as a daycare worker for three years.

33.    Fairfax County records reflect that, in July 2014, Enas Ibrahim completed an application for the Supplemental Nutrition Program ("SNAP") and the Temporary Assistance for Needy Families program ("TANF") operated by Fairfax County. On this form, Ibrahim attested under penalty of perjury that she received no income. She further represented that her husband

11

Adil was employed for 10 hours of work per week at an hourly wage of $9. She further represented that she and Adil held one bank account with a balance of $250, and that they had no other cash, retirement accounts, pension plans, trust funds investments, or other assets or resources.

34.     Based on records from Fairfax County Department of Social Services ("FCDSS"), I know that Enas Ibrahim's application for SNAP benefits, dated July 14, 2014, was approved, and that she was determined to be eligible to receive benefits from August 1, 2014 through July 31, 2015. Ibrahim was approved in August 2014 for a household of five persons, for a total of $646 per month. Also, based on records from FCDSS, I know that Ibrahim was approved for a reinstatement of a TANF grant, dated August 15, 2014 and effective September 1, 2014, for a monthly benefit of $537. The payment history for Ibrahim's TANF case reflects payments of $13,335 between September 13, 2012 and September 1, 2014. Records of TANF payments between November 11, 2014 and June 1, 2015 reflect a total of an additional $6,286.00.

35.     When my FBI colleagues spoke with Adil on March 4, 2016, he told me that he earned about $20,000 annually as a driver; he said that his wife had no income, and had not worked as a daycare provider since 2012. Adil said that the salesman at Brown's Toyota told him that he needed to have a higher income in order to gain approval of the loan, and that he did not know or understand it to be wrong to inflate his income to obtain the loan. He said that he listed on the loan application an income that was substantially higher than what he actually earned.

36.     My FBI colleagues spoke with Ibrahim on March 4, 2016. On that date, Ibrahim said that she received $500 monthly through TANF, and that the rent on their townhouse is subsidized by the Section 8 program. She admitted that, in applying for the loan to buy the 2014

12

Nissan Pathfinder, she and Adil both inflated their income. She said that they both said that they made more money than they actually did in order to get the loan to buy the car. She said that, when they applied for the loan, she was no longer working at the day care job, but said that she still was working at the daycare job and still had income from that job. She said that Adil also said that he had higher monthly income than he actually did. She said that she answered for herself when the dealership employee asked her about her income, and that Adil answered for himself when the dealership employee asked him about his income. She admitted seeing that the loan paperwork said that it was a crime to lie on the loan application, but said that she did it anyway because she hoped that Adil's income would improve as an Uber driver with the Pathfinder. She said that, after having the Pathfinder for several months, they sold it because they found that they could not afford the payments.

37.     On January 8, 2015, Hasan and Ibrahim made a $10,000 down payment on an auto loan that they obtained on the basis of their representations that they jointly earned at least $84,000 annually—including $36,000 that Ibrahim claimed to earn as a daycare worker in a job that she had held for three years. At that time, Ibrahim was receiving benefits from the SNAP and TANF programs through the County of Fairfax on the basis of a representation from 2014 renewal applications with Fairfax County Social Services that (a) she was unemployed and had no income; (b) their joint income was less than $400 a week; and (c) that they had virtually no assets. The representations that Hasan and Ibrahim made to NMAC in January 2015 were inconsistent with the representations that Hasan made to Fairfax County in September and December 2014.

### Conclusion

38.     Based on the foregoing, there is probable cause to believe that, in, on or about

May and June 2013, in Fairfax County and elsewhere in the Eastern District of Virginia, Yousif

Al Mashhadani, Adil Hasan, and Enas Ibrahim each attempted to procure naturalization contrary

to law, in violation of 18 U.S.C. § 1425.

Wherefore, I request the issuance of arrest warrants pursuant to the Federal Rules of

Criminal Procedure.

FURTHER THIS AFFIANT SAYETH NOT.

Sean P. MacDougall
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 27th day of March 2017.

/s/
Ivan D. Davis
United States Magistrate Judge

14